## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

CASE No. 10-4625 (RHK/TNL)

BENJAMIN DEINES,

                     Plaintiff,

v.                                                    **REPORT & RECOMMENDATION**

MICHAEL ASTRUE, Commissioner of
Social Security,

                     Defendant.

>       Gerald S. Weinrich, **WEINRICH LAW OFFICE**, 400 South Broadway, Suite
>       203, Rochester, MN 55904, for Plaintiff; and
>
>       Lonnie F. Bryan, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth
>       Street, Suite 600, Minneapolis, MN 55415, for Defendant.

### I.   INTRODUCTION

Plaintiff Benjamin Deines disputes Defendant Commissioner of Social Security

Michael J. Astrue's (Commissioner) denial of his protective application for disability

insurance benefits (DIB) and supplemental security income (SSI). The United States

District Court for the District of Minnesota has jurisdiction under the Social Security Act.

42 U.S.C. §§ 405(g), 1383(c)(3). This matter is before this Court, United States

Magistrate Judge Tony N. Leung, for a report and recommendation to United States

District Court Judge Richard H. Kyle on the parties' cross motions for summary

judgment. *See* 28 U.S.C. § 636(b)(1); D. Minn. LR 72.1-2.

Benjamin Deines and his family deserve sympathy.  The record supports that Mr. Deines has confronted obstacles and prejudices throughout his life as a result of his Asperger's Disorder.[1]  These obstacles and prejudices have no doubt been difficult for him and his family to endure.  Nevertheless, the record also supports the conclusion of the Administrative Law Judge (ALJ) that Mr. Deines is not "disabled" as defined by 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). *See also* 20 C.F.R. §§ 404.1505, 416.905. Therefore, **IT IS HEREBY RECOMMENDED** that the Commissioner's Motion for Summary Judgment (Docket No. 15) be **GRANTED** and that Plaintiff's Motion for Summary Judgment (Docket No. 9) be **DENIED.**

## II.    BACKGROUND

### a.  Procedural Posture

On June 6, 2007, Deines filed his application for DIB and his protective application for SSI.  Tr. 9.  Deines alleged a disability onset date of March 3, 2007.  Tr. 9, 145.  These applications were denied on October 2, 2007, and upon reconsideration on December 28, 2007.  Tr. 9, 56-60, 63-65, 68-73.  Deines requested a hearing before an

---

[1] Throughout the record, Deines's condition is referred to as "Aspergers," "Asperger's Disorder," and "Asperger's Syndrome." This Court notes that the National Institute of Neurological Disorders and Stroke (NINDS) uses the term "Asperger's Syndrome," NINDS, ASPERGER SYNDROME FACT SHEET (Jan. 2005), *available at* http://www.ninds.nih.gov/disorders/asperger/detail_asperger.htm, whereas the American Psychiatric Association's (APA) DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS uses the term "Asperger's Disorder." APA, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 80 (4th ed. Text Revision 2000) (hereinafter "DSM-IV-TR"). This Court adopts the term "Asperger's Disorder" because that is the term used by the Social Security Administration. *See* Social Security Ruling ("SSR") 09-4p, *Title XVI: Determining Childhood Disability – The Functional Equivalence Domain of "Attending and Completing Tasks"*, 2009 WL 396033 (Feb. 18, 2009).

ALJ. Tr. 77-80. Deines had a hearing before ALJ Leonard A. Nelson on October 19, 2009. Tr. 9, 84-95, 107-111, 116-121.

On January 21, 2010, the ALJ issued his decision. Tr. 6-17. The ALJ made the following findings of fact and conclusions of law: Deines has not engaged in substantial gainful activity since March 3, 2007. Tr. 11. Deines has the severe impairments of Asperger's Disorder, depression, anxiety, and attention deficit hyperactivity disorder (ADHD). Tr. 11. Deines does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.02, 12.04, 12.06, and 12.10. Tr. 12.

The ALJ also found and concluded as follows: Deines has the residual functional capacity (RFC) to perform a full range of work at all exertional levels, with the following limitations: He cannot tolerate changes in his work routine; he is limited to brief, superficial, and infrequent contact with others; and he is limited to simple and unskilled work. Tr. 13. In reaching this conclusion, the ALJ placed greater weight on the opinions of James Felling, Ph.D., the medical expert; the state agency psychologists; Elizabeth Andresen, the examining psychologist; and Barbara Luskin, Ph.D. Tr. 13-14. The ALJ placed less weight on Cynthia Cleveland, M.D.'s opinion because Dr. Cleveland's opinion was inconsistent with the record as a whole. Tr. 14.

The ALJ also found and concluded as follows: Deines is unable to perform any past relevant work, but considering Deines's age, education, work experience, and RFC, there are jobs that exist in significant numbers that Deines can perform. Tr. 15-16. Thus, Deines has not been under a disability from the alleged onset date. Tr. 16.

On January 21, 2010, Deines requested review of the ALJ's decision. Tr. 1, 52. On September 18, 2010, the Appeals Counsel denied his request for review. Tr. 1-5. On November 16, 2010, Deines filed his Complaint (Docket No. 1) in this matter. Both parties filed motions for summary judgment. *See* Docket Nos. 9, 15.

### b. Deines's Educational Background and Work History

Deines was born in 1971 and he was 36-years old at the time of his application for DIB and SSI on June 6, 2007. Tr. 9, 140. In 1994, Deines graduated with a Bachelor of Arts degree, with double majors of English and philosophy. Tr. 239. Deines also attended graduate school where he studied creative writing. Tr. 353.

Deines has an employment history going back to 1994. Tr. 155-162; *see also* Tr. 201-08 (Work History Report). Deines reported that he does not remember the specific tasks for most his past positions and he was terminated from many of these positions because of his depression or his Asperger's Disorder. Tr. 262.

From 1997 to 2001, Deines worked for West Publishing Corporation. Tr. 157-158. While at West Publishing, Deines's job responsibilities consisted of answering telephones and helping customers with technical support problems. Tr. 176. Deines was terminated from West Publishing for not returning a telephone call. Tr. 198. Deines held five different jobs from 2001 to 2003. Tr. 158, 176. In 2003, Deines began working for Half Price Books. Tr. 158. In February 2007, Deines was still employed by Half Price Books and was working 40-hours per week. Tr. 54, 159. In March 2007, Deines began working for Ranstad Inhouse Services as a "laborer." Tr. 243. He worked 40 hours per week as a laborer until May 14, 2007, when the work ended. Tr. 243. In the fall of 2007,

Deines was employed by Securitas Security Services. Tr. 148, 161, 167-168. At Securitas Security Services Deines worked 20-to-24 hours per week as a security guard. Tr. 222-23.

### c. Medical History

#### i. Medical History from Pre-2001

In 1995, Deines underwent a psychiatric evaluation by Dr. Cleveland.  Tr. 336. After considering Deines's symptoms, family psychiatric history, past medical history, psychosocial history, and conducting a mental status examination, Dr. Cleveland diagnosed Deines with recurring major depression and avoidance traits. Tr. 337-38. Dr. Cleveland concluded that Deines's Global Assessment of Function (GAF) score was 55 and was 50 during the past year.[2] Tr. 338; *see also* Tr. 416-18. Between May 1995 and July 2001, Deines saw Dr. Cleveland sporadically for therapy and for management of his medications.  Deines's treatment records from his sessions with Dr. Cleveland reflect that Dr. Cleveland believed that throughout this time Deines had difficulty concentrating, focusing, and interacting socially. Tr. 419-27.

#### ii. Medical History from 2001 to Alleged Onset Date

In August 2001, Deines saw Alford S. Karayusuf, M.D.  Tr. 413-15. Dr. Karayusuf diagnosed Deines with dysthymia and listed his prognosis as "guarded." Tr.

---

[2] A GAF score between 41 and 50 constitutes a "[s]erious symptoms (e.g., suicidal ideation . . . ) OR any serious impairment in social occupational, or school functioning (e.g., no friends, *unable to keep a job*)."  APA, DSM-IV-TR, at 34 (emphasis added). A GAF score between 51 and 60 constitutes "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.*

415. Dr. Karayusuf "[c]onclu[ded]" as follows: "[Deines] is able to understand, retain, and follow instructions. He is able to interact appropriately with fellow workers, supervisors, and the public. He is able to maintain pace and persistence." Tr. 415.

From December 2001 through August 2002, Deines saw Howard Dickman, Ph.D. for counseling.  Tr. 429-45.  The notes from these sessions are handwritten and in some instances difficult to decipher. During these sessions, Deines frequently discussed his troubles finding and maintaining employment as well as his troubles with social interaction. *Id.* Throughout this time, Dr. Dickman concluded that Deines's GAF was between 55 and 65.  Tr. 429-45.  Deines also saw various psychiatrists in connection with his counseling with Dr. Dickman and was prescribed medications. Tr. 429-45.

On January 24, 2003, Deines saw Adnan Pakyurek, M.D. for a psychiatric evaluation. Tr. 321. Deines's parents reported to Dr. A. Pakyurek that Deines had a long history of social difficulties beginning in grade school. Tr. 321-22. Deines's parents also reported that Deines had intermittent depression since high school. Tr. 322. Deines reported feeling depressed, lonely, and having suicidal thoughts the summer of 2003. Tr. 324.  Deines also reported that his sister, brother-in-law, and his parents are his main social contacts. Tr. 324. Dr. A. Pakyurek noted from the examination that Deines's mood was depressed, his eye contact was poor, he was fidgety, his affect was constricted, and his speech was slowed. Tr. 323. But, Dr. A. Pakyurek noted that Deines's attention, concentration, and short-term memory were all intact, and Deines had good insight and judgment. Tr. 323-24. Dr. A. Pakyurek diagnosed Deines with depressive disorder and

Asperger's Disorder. Tr. 324. Dr. A. Pakyurek determined that Deines's GAF was 65.[3]
Tr. 324.

On February 23, 2003, Deines saw Timothy Lang, Psy.D., L.P. for
psychoeducational testing. Tr. 326. The testing revealed that Deines had an average range
of intellectual functioning, with an IQ of 105. Tr. 326. Deines had above-average verbal
functioning and average performance functioning. Tr. 326. Dr. Lang noted that this split
in functioning is often seen in Asperger's Disorder. Tr. 326. Deines also had superior or
average skills in many verbal areas, except for his ability to sequence numbers and letters
from auditory recall. Tr. 326. He had high average or average skills on many
performance areas, except a "task measuring part whole visual conceptualization skills"
and "tasks measuring search for abstract symbols . . . [and] search for abstract and family
symbols." Tr. 326.  Furthermore, Deines's ability to process information efficiently was
considered to be "very poorly developed." Tr. 326.

Dr. Lang also noted that while Deines's reading and spelling skills were at the
post-high school level, Deines math skills were at the pre-high school level. Tr. 327. Dr.
Lang concluded that "[i]t is possible that he may struggle with daily tasks requiring
mathematical skills." Tr. 327. Dr. Lang stated that Deines had "an intense conflict
between his desire to withdraw from personal relationships, his fear of independence, and
a growing sense of unworthiness and despondency." Tr. 327. Dr. Lang also concluded
"[a] pattern of dysthymia is an integral part of this man's characterological structure." Tr.

---

[3] *See supra* n. 2.

328. Finally, Dr. Lang noted the Deines was cooperative during testing and completed all tasks requested of him. Tr. 328.

On July 9, 2004, Deines saw CynDee Pakyurek, Ph.D. for a therapy session. Tr. 318. Deines reported that his depression was intense, he was lonely, "he sometimes wishe[d] he was dead," and he was having problems at work meeting the pace requirements and working with customers. Tr. 318. Dr. C. Pakurek noted that Deines lacked insight and he "ha[d] short-term and concentration difficulties, exacerbated by both his depression and attention difficulties." Tr. 318. Dr. C. Pakurek diagnosed Deines with depressive disorder, anxiety disorder, and Asperger's Disorder. Tr. 319.

In October 2005, Deines underwent a consultation with the Autism Society of Minnesota. Tr. 518. Deines's mother completed an extensive questionnaire and wrote a narrative in connection with this consultation. Tr. 518-22. The narrative described that from an early age, Deines was highly competent in terms of language skills, but his social interaction and communication skills lagged behind his peers. *Id.* Through the Autism Society of Minnesota, Deines saw Dr. Luskin on an approximately monthly basis from 2005 to 2009. Tr. 524-58. Many of the notes from these sessions are handwritten, difficult to decipher, and are more akin to keywords, used for refreshing Dr. Luskin's recollection of sessions, rather than offering substantive documentation. The handwritten notes suggest that the following elements of Deines's life were discussed: his search for employment, his interaction with coworkers and managers, his relationship with his parents, and his goals for improving his living situation and his social skills. Tr. 524-58.

Other treatment notes from Dr. Luskin will be discussed in greater detail later in this summary of the record.

On May 6, 2006, Deines saw Dr. Cleveland. Tr. 339. Dr. Cleveland noted that "it continues to be challenging to find a group of medications that are helpful for him . . . ." Tr. 339. Dr. Cleveland noted that "[Deines] has done very well other than the lethargy that sometimes comes from medications." Tr. 339.

On October 3, 2006, Dr. Cleveland wrote a letter in support of Deines's application for benefits. Tr. 350-51. Dr. Cleveland summarized her treatment records with Deines and reported that Deines has an IQ of over 140 and a desire to work, but he cannot initiate any new plans for himself. Tr. 351. Dr. Cleveland also noted that the focus of her treatment "has primarily been on working with a variety of medications that help [Deines] keep his mood improved enough for him to function at the level that he sees to be satisfactory." Tr. 351.

On December 14, 2006, Deines saw Dr. Cleveland. Tr. 339. Deines reported that he finds it difficult to remember to be available for appointments and that his medications are "somewhat helpful, but not a 100% satisfaction." Tr. 339.

### iii.  Medical History After Alleged Onset

On May 23, 2007, Deines saw Dr. Cleveland. Tr. 339.  Deines came to the appointment with his mother because he recently moved in with his parents. Tr. 339. Dr. Cleveland noted that "although I believe he was taking the medicines consistently, [he] did not do any of the other vital things that are needed to maintain his overall health." Tr. 339.

On June 7, 2007, Dr. Luskin completed an examination of Deines. Tr. 330-332; *see also* Tr. 514-17.  Dr. Luskin noted that Deines had difficulties finding and keeping a job, and living independently. Tr. 330. Dr. Luskin noted that Deines recently moved in with his parents after leaving his job at Half Price Books. Tr. 330. Deines left this job "on the advice of his psychiatrist and [Dr. Luskin], when the social pressures became so great that they triggered profound depression." Tr. 330. Dr. Luskin noted that Deines had difficulty initiating and maintaining interaction, planning and organizing his time in order to meet his own goals, and recognizing and evaluating possible courses of action. Tr. 330.

Dr. Luskin administered the Vineland Adaptive Behavior Scales-II (VABS II), which indicated that Deines functioned "well below average" in his communication, daily living, socialization, and adaptive behavior skills.  Tr. 331. Dr. Luskin concluded that the results of the VABS II indicated "significant functional limitations in [Deines's] understanding and use of language, Self-direction, and Capacity for independent living as well as some areas of Self Care."  Tr. 332. Dr. Luskin also concluded Deines "display[ed] symptoms of severe depression" and "[h]is difficulties . . . stem from primarily from his cognitive difficulties in assessing social situations and thinking flexibly rather than from primary mental health issues." Tr. 332. Dr. Luskin concluded that "services available to persons with developmental disabilities . . . are necessary to enable Mr. Deines to function successfully at this time." Tr. 332.

On June 13, 2007, Deines saw James Riggott, M.S., L.P., for a diagnostic intake assessment in order to begin therapy. Tr. 385.  Mr. Riggott observed that Deines had avoidant eye contact, abnormal or robotic gait, moderately impaired insight, depressed

mood and flat or blunted affect. Tr. 388. Mr. Riggott concluded Deines's psychosocial and environmental problems to be social, occupational, and economic. Tr. 389. Mr. Riggot also concluded that Deines's GAF was 50[4] and his prognosis was "fair." Tr. 389.

The record indicates that Deines saw Mr. Riggott from July 2007 through October 2007 for therapy. Tr. 390-99. The notes from these appointments are handwritten and substantially illegible.  Of note, there were no updates to Deines's diagnoses, and Mr. Riggott stated that Deines made "slight" improvements. *Id.*

On June 20, 2007, Deines saw Dr. Cleveland. Tr. 340. Deines's medication regimen was adjusted. Tr. 340. On July 25, 2007, Deines again saw Dr. Cleveland. Tr. 340. Deines's medication regimen was adjusted. Tr. 340. On August 30, 2007, Deines again saw Dr. Cleveland. Tr. 340. Dr. Cleveland noted that he "maintained a stable mood, ha[d] overall normal energy, [was] bright in affect, ha[d] good eye contact, and seem[ed] as spontaneous as [Dr. Cleveland has] seen him." Tr. 340.

In November 2007, Deines saw Dr. C. Pakyurek for therapy. Tr. 404. Deines reported that he continued to struggle with depression and social problems. Tr. 404. Deines reported that he has difficulty concentrating on reading when feeling depressed. Tr. 404. Deines also reported that he was socializing with a high school acquaintance. Tr. 404. Dr. C. Pakyurek observed that Deines did not speak spontaneously, kept his eyes downcast, had an awkward gait, had an "extremely constricted" affect, and spoke in a soft, slowed manner.  Tr. 404-05. Dr. C. Pakyurek concluded that Deines's "social ability is quite impaired." Tr. 405.

---

[4] *See supra* n. 2.

Between January 2008 and June 2008, Deines saw Dr. C. Pakyurek. Tr. 455-94. Throughout all of these sessions Dr. C. Pakyurek consistently observed that Deines did not have any hygiene issues, and Deines was oriented to person, place, and time. Tr. 405, 457, 460, 463, 466, 468, 470, 473, 476, 489, 492.  Dr. C. Pakyurek also commented on Deines memory, and noted in some instances that it was intact notwithstanding his history of being disorganized when asked to multitask, Tr. 457, 460, 463, 466, 468, 470, 473, 489; and in other instances she noted that while Deines judgment was intact his short term memory was poor. Tr. 470. Dr. C. Pakyurek's reports from these encounters detail numerous events happening within Deines's life, including his attempts to improve his social interaction skills. Until the end of treatment, Dr. C. Pakyurek consistently diagnosed Deines with dysthymic disorder, anxiety disorder, Asperger's Disorder, history of major depressive disorder, and predominantly inattentive type ADHD. Tr. 455, 460, 463, 466, 468, 473, 476.

On January 3, 2008, Deines saw Dr. C. Pakyurek for therapy. Tr. 475.  Dr. C. Pakyurek noted that Deines had been dysphoric and anxious. Tr. 476. Dr. C. Pakyurek noted that he was able to stay on task during their session, but had problems in his life with forgetfulness and disorganization. Tr. 476.

On February 5, 2008, Deines saw Dr. C. Pakyurek for therapy.   Tr. 469. Deines reported that he went to dinner with a friend, but he did not feel the dinner went well. Tr. 469. He reported that he does not have conversations with his parents. Tr. 469.

On March 10, 2008, Deines saw Dr. C. Pakyurek for therapy. Tr. 465. Dr. C. Pakyurek noted that his "mood continue[d] to be moderately depressed, but this [was] an improvement from several weeks ago." Tr. 465.

On April 10, 2008, Deines saw Dr. C. Pakyurek for therapy. Tr. 462. Deines reported that he tends to stay to himself, listening to music. Tr. 462. Deines also reported that he exercises at the YMCA. Tr. 462. Deines reported that he works two days per week and "felt more confident at his job." Tr. 462. Deines also reported that he was able to talk to his parents about their recent vacation. Tr. 462.

On April 22, 2008, Deines saw Dr. C. Pakyurek for therapy. Tr. 459. Deines reported that he worked two days per week and "fe[lt] competent in his job." Tr. 459. Dr. C. Pakyurek noted that "[c]ompared to prior jobs that he has had, this job he [was] finally successful at. He [was] able to go to work, stay focused and organized, and [be] competent at his job." Tr. 459. Deines also reported that he volunteered at the Humane Society and the library. Tr. 459. Deines also reported that he was exercising at the YMCA. Tr. 460.

On May 8, 2008, Deines saw Dr. C. Pakyurek for therapy. Tr. 455. Deines reported that he worked two days per week and that he felt "okay." Tr. 455. Deines also reported that he exercises at the YMCA weekly. Tr. 455. Deines reported that he spent most of his time laying around his parent's home reading. Tr. 455.

On May 22, 2008, Deines saw Dr. C. Pakyurek for therapy. Tr. 488. Deines reported that his depression increased since the last session. Tr. 488. Deines reported that he continued to work and volunteer, but "he ha[d] not been getting out of the house as

much as he had been . . . [and] he ha[d] been isolating more at home, reading, and falling asleep." Tr. 488.

On June 6, 2008, Deines saw Dr. C. Pakyurek for therapy. Tr. 491. Deines reported that he was less depressed than he was at his previous session. Tr. 491. Deines also reported that he recently visited his sister, which required driving from Austin, Minnesota, to the Twin Cities. Tr. 491. Deines stated that he stopped volunteering at the Humane Society. Tr. 491. Dr. C. Pakyurek noted that his mood had been mildly dysthymic and his affect was anxious. Tr. 492. Dr. Pakyurek diagnosed Deines with dysthymic disorder, anxiety disorder, Asperger's Disorder, and ADHD. Tr. 492. Dr. C. Pakyurek concluded that Deines's major depressive disorder was in remission. Tr. 492. In June 2008, Deines reported that "Lamictal ha[d] really helped . . . his depression and mood stability." Tr. 483.

Deines session with Dr. C. Pakyurek ended when she moved. Tr. 494. In October 2008, Deines reported to Dr. Keith Kleis that he wished to discontinue therapy because "things are going fairly well right now." Tr. 494.

In February 2009, Dr. Cleveland completed a progress note, wherein she listed Deines's diagnoses as recurrent major depression and Asperger's Disorder. Tr. 498. Dr. Cleveland assessed Deines's GAF to be 40.[5] Tr. 498.

---

[5] A GAF of 40 consists of "[s]ome impairment in reality testing or communication OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." DSM-IV-TR, at 34.

In October 2009, Dr. Cleveland completed an Autistic and Other Pervasive Developmental Disorders Professional Source Data Sheet in support of Deines's applications for DIB and SSI. Tr. 502. Dr. Cleveland concluded that Deines had affective disorder, resulting in qualitative deficits in reciprocal social interaction, qualitative deficits in verbal and nonverbal communication, marked difficulties in maintaining social functioning, markedly restricted repertoire of activities, and marked inattention. Tr. 504-06. Dr. Cleveland concluded that Deines had moderate and marked limitations in his understanding and memory, sustained concentration and persistence, and social interaction and adaptation. Tr. 510-11.

### d.  Records from DIB and SSI Application

#### i.  *Interview & Disability Report*

On June 21, 2007, Deines participated in an interview in support of his applications for DIB and SSI. Tr. 170-73. The interviewer found no evidence of any limitations. Tr. 172-73.

On or about June 21, 2007, a Disability Report was completed in support of Deines's applications for DIB and SSI.[6] Tr. 174-81. Deines reported as follows: His conditions included depression, Asperger's Disorder, and "trouble concentrating." Tr. 175. As a result of his conditions, he missed social cues, had difficulty remembering instructions, and had difficulty completing tasks with multiple steps.  Tr. 175. In the past, he attempted to seek accommodations from his employers, but his supervisors have been

---

[6] It appears from the record that Deines's mother, Judy J. Deines, assisted Deines with completing the telephone interview that yielded the Disability Report. Tr. 174-81.

unwilling to write down instructions for him and his coworkers have been "[un]helpful and played jokes on him." Tr. 175.

On November 20, 2007, Deines completed a second Disability Report in support of his appeal. Tr. 233. Deines reported that he had no changes in his conditions since his last report, but he had been seen for his conditions since his last disability report. Tr. 234. Deines reported that his conditions resulted in feelings of isolation and his "extreme difficulty making friends and keeping jobs." Tr. 238.

Deines completed a third Disability Report. Tr. 284. He reported that his condition had changed in that he now had a hard time concentrating, he got angry more often, and he lost control of his emotions more often. Tr. 285. The remainder of his third Disability Report is substantially similar to his second Disability Report.

### ii. *Function Reports*

On July 20, 2007, Deines completed a Function Report in support of his applications. Tr. 192-199. Deines reported as follows: He lived at home with his parents. Tr. 192. His days consisted of eating, watching television, and reading. Tr. 192. He had no problems with personal care, house and yard work, getting around, or handling money. Tr. 194. He did not spend time with others and he did not go out on a regular basis. Tr. 196. He also had difficulty concentrating and sleeping as a result of his conditions. Tr. 193. His concentration difficulties made reading difficult. Tr. 196. He could follow written instructions, but he had difficulty with verbal instructions. Tr. 197. There is some ambiguity as to his ability to complete tasks. Deines checked a box that

indicated his conditions impacted his ability to complete tasks, but later he also reported that his ability to concentrate on tasks "varie[d]" and he finished what he starts. Tr. 197.

On July 20, 2007, Deines's mother completed a third-party Function Report. Tr. 183. Deines's mother reported about Deines's conditions as follows: Deines's depression and medications caused him to sleep more and caused him to have difficulty concentrating. Tr. 184, 187. Deines's anxiety caused him to have less energy and initiative. Tr. 184. As a result of his Asperger's Disorder, Deines "NEVER initiate[d] conversations or activities" with other people. Tr. 188. Deines has always had "GREAT difficulty in social situations." Tr. 184; *see also* Tr. 190.

Deines's mother also reported about Deines's activities as follows: Deines read, wrote, and watched films and news programs all day. Tr. 183. Deines would walk the dog if asked. Tr. 184. Deines sometimes needed to be reminded to shave and dress appropriately.  Tr. 185.  Deines could prepare food for himself. Tr. 185. Deines rarely cleaned and did laundry weekly if he was reminded.  Tr. 185.  Deines went outside daily and traveled by walking, riding in a car, and using public transportation. Tr. 186. Deines went shopping as need for groceries, personal care items, and prescriptions. Tr. 186. Deines was able to pay bills, count changed, and used a checkbook, but he had difficulty "stay[ing] on top of finances." Tr. 187.

Deines's mother also reported about Deines's abilities as follows: Deines had difficulty completing tasks, concentrating, following instructions, and getting along with others. Tr. 188. Deines found written instructions helpful and verbal instructions were difficult for him to follow and he did not ask for clarification. Tr. 188. Deines had

difficulty multitasking. Tr. 189. Deines did not handle stress well and change was difficult for him. Tr. 189.

On December 12, 2007, Deines completed a second Function Report in support of his applications. Tr. 273-80. Deines's second Function Report is substantially similar to his first Function Report.  In addition to what was stated in his first Function Report, Deines stated in his second report that he had memory difficulties and difficulty talking. Tr. 278. But, Deines reported that he usually finishes what he starts and he can follow written instructions "fine." Tr. 278. On December 12, 2007, Deines's mother completed a second Function Report. Tr. 264-271. Her second Function Report is substantially similar to her first report.

### e.   Examination

In September 2007, Deines underwent a Mental Status Examination and Activities of Daily Living Assessment, which was conducted by Elizabeth C. Andresen, M.S., L.P. Tr. 352-55. Deines reported to Ms. Andresen that "his emotional pain on medication [was] at 3 (0=no pain, 10=incapacitating) and before the medication at 7 or 8." Tr. 353. Deines reported that his daily activities consisted of reading, watching movies, doing household chores, tending to his hygiene and grooming needs, occasionally preparing meals, and managing his finances. Tr. 353-54.

After reviewing Deines's memory, social judgment, decision making, insight, and self-image, Ms. Andresen concluded that Deines had above-average intelligence, and "significant impairment in skills necessary for social interaction and following work related instruction." Tr. 354.  Ms. Andresen also noted that Deines memory "was intact

for delayed, short-term, recent, and remote," and "[h]e was able to recall 2 digits forward and backward and 3 digits forward." Tr. 354. Ms. Andresen also noted that Deines confides in his parents. Tr. 354. Ms. Andresen noted that Deines does well with routine tasks, but he does not do well "with structuring and organizing his time, following multiple step directions or approaching others with questions or comments." Tr. 354.

Ms. Andresen diagnosed Deines with Asperger's Disorder, recurrent and moderate major depressive disorder. Tr. 355. Ms. Andresen assessed his GAF to be 44.[7] Tr. 355.

### f.  State Agency Consultation

In October 2007, Sharon Frederiksen, Ph.D., L.P., completed a Request for State Agency Consultant Advice, Psychiatric Review Technique, and Mental RFC Assessment. Tr. 360-80. Dr. Fredericksen's report was affirmed as written by James M. Alsdurf, Ph.D., L.P. Tr. 409-11.

Dr. Fredericksen reviewed listings 12.04 (affective disorders) and 12.10 (autism and other pervasive developmental disorders).  Tr. 363.  As to listing 12.04, Dr. Fredericksen concluded that Deines had a disturbance of mood accompanied by depressive syndrome, but noted that Deines's impairment did not precisely satisfy the diagnostic criteria, Deines had been treated for years, and Deines was "better and stable on current" medications. TR. 366. As to listing 12.10, Dr. Fredericksen also concluded that Deines had a medically determinable impairment that did not precisely satisfy the diagnostic criteria.  Tr. 372.

---

[7] *See supra* n. 2.

Dr. Fredericksen rated Deines's functional limitations as follows: Deines had mild restriction of activities of daily living. Tr. 373. Deines had moderate difficulties maintaining social functioning and concentration, persistence, or pace. Tr. 373. Dr. Fredericksen reviewed and summarized his treatment records from 2007 back to 1995 and concluded that the treatment records do not support Deines was disabled and unable to work. Tr. 375. Dr. Fredericksen noted that the records support that he needed help finding a job and keeping organized. Tr. 375. Dr. Fredericksen also noted that based upon her review of the record there was no evidence that Deines was unable to work and she noted that he had two jobs for sustanined periods of time. Tr. 375.

Dr. Fredericksen also completed a Mental RFC Assessment and noted the following limitations: Deines had a moderate limitation in his abilities to (1) maintain attention and concentration for an extended period of time, (2) perform activities within a schedule, (3) complete a normal workday or workweek without interruptions from psychologically based symptoms, (4) interact appropriately with the general public, (5) accept instructions and respond appropriately to criticism, (6) respond appropriately to changes in his work setting, and (7) set realistic goals or make plans independently. Tr. 377.  Dr. Fredericksen concluded that Deines could (1) concentrate on, understand, and remember 3-to-4 step, detailed instructions, (2) handle brief and superficial contact with others, and (3) handle supervision by a reasonably non-authoritarian supervisory style. TR. 379.

### g. Hearing

Deines appeared for a hearing before the ALJ on October 19, 2009. Tr. 9. Deines, Dr. Felling, and Steven D. Bosch testified at the hearing.

### i. Deines's Testimony

Deines testified, in part, as follows: He lived alone, did housework, took care of his hygiene, and cooked. Tr. 28-29. He watched television two-to-three hours per day. Tr. 29. He read for four hours per day. Tr. 30. He worked 16-hours per week as a security guard, but he could not work more than that because it would involve interacting with people or working overnight. Tr. 32. His thought process was "okay." Tr. 33. His main problem was getting along with people. Tr. 33.

### ii. Dr. Felling

Dr. Felling testified as a medical expert at the hearing. *See* Tr. 104 (listing the professional qualifications of Dr. Felling). Dr. Felling testified as follows: Although Deines had been diagnosed with "major depressive disorder," "depression not otherwise specified," and "dysthymia," Dr. Felling believed that dysthymia was the most fitting diagnosis based upon the record. Tr. 41. Dr. Felling also noted that Deines had also been diagnosed with anxiety, attention deficit disorder, and Asperger's Disorder. Tr. 41. Dr. Felling further testified that, as to the "paragraph B" criteria, the restriction of Deines's activities of daily living would be moderate. Tr. 42. Dr. Felling concluded that Deines would have particularly moderate difficulties with respect to social skills and moderate difficulties with respect to concentration, persistence, and pace. Tr. 42. Dr. Felling concluded that no "paragraph C" criteria were involved. Tr. 42. On cross-examination,

Dr. Felling testified one possibility for the decrease in his depression from 2007 onward was that he was in a supportive environment. Tr. 42.

### iii.   Steven D. Bosch

Steven D. Bosch testified as the vocational expert. *See* Tr. 102 (listing professional qualifications of Steve Bosch). *See also* 306. The ALJ presented Bosch with a hypothetical individual who was identical to Deines in all relevant respects and had the following non-exertional limitations: He could not work in jobs that required change in routine or job function; he could only have brief and superficial, infrequent contact with the public and fellow employees; and he could only perform simple, unskilled work. Tr. 48. Bosch testified that there are positions in the relevant economy that such a hypothetical individual could perform. Tr. 49.

On cross-examination, Bosch was presented with a hypothetical individual identical to the individual above, with the following additional limitations: The individual could not concentrate more than a few minutes at a time; the individual could not maintain a regular schedule; he could not work in coordination or in proximity; and could not have any contact with others. Tr. 49. Bosch testified that there are no positions in the relevant economy that such a hypothetical individual could perform. Tr. 50.

## III.   ANALYSIS

### a.  Standard of Review

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole and not affected by error of law.   42 U.S.C. §§ 405(g), 1383(c)(3); *Murphy v. Sullivan*, 953 F.2d 383, 384

(8th Cir. 1992); .  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quotation omitted).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis." *Id.* (quotation omitted).

The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  A Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin*, 811 F.2d at 1199.

To be entitled to DIB and SSI, a claimant must be disabled. 42 U.S.C. §§ 423(a)(E), 1382(a)(1).  A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in

20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. §§ 404.1520(a)(5)(i)-(v); 416.920(a)(4)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

In the present case, Deines only challenges the ALJ's weighing of the medical opinions in the record at steps three through five. For the reasons set forth below, this Court concludes that the ALJ did not err in weighing the medical opinions and the ALJ's determinations at steps three through five are supported by substantial evidence in the record as a whole.

### b. Drs. Cleveland & Luskin's Opinions

An ALJ must consider medical opinions from treating and nontreating sources, 20 C.F.R. §§ 404.1527(d), 416.927(d), and an "ALJ must resolve conflicts among the various opinions." *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. By contrast, the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Jenkins v. Apfel*, 196 F.3d 922, 924-25 (8th Cir. 1999) (quotations omitted.) Nevertheless, "a . . . physician's opinion is afforded less deference when the medical evidence in the record as a whole

contradicts the opinion." *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007) (citation and quotation omitted); *see* 20 C.F.R. § 404.1527(d)(6) (stating that the ALJ must consider "any factors . . . which tend to support or contradict the [physician's] opinion."); *Woolf*, 3 F.3d at 1214; *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).

Deines contends that ALJ did not give adequate consideration to the medical opinions of Drs. Cleveland and Luskin concerning Deines's Asperger's Disorder. For the reasons set forth below, this Court concludes that the ALJ did not err in its weighing Dr. Cleveland's opinion.

As to Dr. Cleveland, the ALJ stated as follows:

> [Dr. Cleveland] has indicated that [Deines] has marked limitation in many areas including ability to understand, remember and carry out very short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, work in coordination or proximity to others, make simple work-related decisions. . . . The record is not supportive of the extreme degree of limitation Dr. Cleveland identifies. The fact that [Deines] has volunteered at two jobs contradicts almost all of Dr. Cleveland's observations. [Deines] does a great deal of reading, contradicting Dr. Cleveland's assessment that he cannot maintain attention and concentration for extended periods.

Tr. 14. As this section articulates, the ALJ did not outright reject Dr. Cleveland's observations and conclusions. The ALJ merely stated that "[t]he record is not supportive of the *extreme degree* of limitation Dr. Cleveland identifies." Tr. 14 (emphasis added). The ALJ did not err in granting less weight to Dr. Cleveland's opinion where the ALJ found it to be inconsistent with the record as a whole. This is a permissible consideration

under 20 U.S.C. §§ 404.1527(d) and 416.927(d), and the ALJ was not required discuss in detail each factor under 20 U.S.C. §§ 404.1527(d) and 416.927(d) where the weight given to an opinion is largely determined by just one factor.

Furthermore, the ALJ noted Deines's volunteer work and reading habits contradict the "extreme degree of limitation" identified by Dr. Cleveland. Tr. 14. In reaching this conclusion, the ALJ clearly relied primarily upon Dr. C. Pakyurek's observations and opinions because the inconsistencies cited by the ALJ are drawn only from Dr. C. Pakyurek's treatment notes.  Like Dr. Cleveland, Dr. C. Pakyurek was a treating physician.  Moreover, Dr. Cleveland described her role with Deines as primarily limited to medication management.  In contrast to Dr. Cleveland, Dr. C. Pakyurek's treatment records are consistent with the state agency psychologists, the examining psychologist, and Dr. Felling. The ALJ did not err in assigning more weight to these opinions due to their consistency.

Deines argues that the inconsistencies cited by ALJ in weighing Dr. Cleveland's opinion are not actual inconsistencies because Deines's volunteer activities and reading habits are consistent with a diagnosis of Asperger's Disorder and the other aspects of his diagnosis render him disabled.  But, there is no dispute in the record concerning Deines's diagnosis and a diagnosis alone is not determinative of disability under 42 U.S.C. §§ 405(g) and 1383(c)(3).

The ALJ did not err in his reading of Dr. Luskin's opinion. As to Dr. Luskin, the ALJ stated as follows:

> Dr. Luskin noted that the claimant functioned well below in all areas including communication, daily living skills, socialization, and adaptive behavior. . . . However, Dr. Luskin does not state that [Deines] is unable to work. In fact, she notes that with job training, ongoing therapy and other services available to persons with developmental disabilities, [Deines] could function successfully.

Tr. 14.  In light of Dr. Luskin's opinion, the ALJ was not required to equate "significant functional limitations" with a "marked" limitation, or the "standard for measuring the degree of limitation" under listing 12.00. 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.00.C. The limitations that can be ameliorated with training, that were cited by Dr. Luskin, are consistent with the moderate limitations noted by the nonexamining sources.

Thus, for the reasons set forth herein, the ALJ did not err in weighing the medical opinions.

### c.  Step Three: Medical Impairment

Deines challenges the ALJ's conclusion that Deines's Asperger's Disorder did not meet or equal listing 12.02, 12.04, or 12.10.  Deines contends that had the ALJ given proper weight to his treating physicians—Drs. Cleveland and Luskin—the ALJ would have concluded that Deines's Asperger's Disorder (and associated symptomology) would meet or equal a list impairment. For the reasons set forth below, this Court concludes that the ALJ's conclusion at step three of the sequential process is supported by substantial evidence in the record as a whole.

At step three in the sequential analysis, the ALJ must consider whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

A claimant bears the burden of establishing the impairment is a disabling impairment under 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 891 (1990). Medical equivalency requires that the claimant's impairment be at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. §§ 404.1526(a), 416.926(a). "An impairment which can be controlled by treatment or medication is not considered disabling." *Estes v. Barnhardt*, 275 F.3d 722, 725 (8th Cir. 2002) (citation omitted).

In the present case, the ALJ concluded that Deines's impairments did not satisfy the "paragraph B" criteria for listing 12.02, 12.04, or 12.10. Listing 12.02 is an impairment of brain function, characterized by an "abnormal mental state and loss of previously acquired functional abilities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, at 12.02. Listing 12.04 is an impairment "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." *Id.* at 12.04. Listing 12.10 is an impairment "[c]haracterized by qualitative deficits in the development of reciprocal social interaction, in the development of verbal and nonverbal communication skills, and imaginative activity." *Id.* at 12.10.

An impairment or combination of impairments meets or equals listing 12.02, 12.04, and 12.10 when the individual has a "[m]edically documented findings" of various symptoms (or "paragraph A" criteria) and at least two of the following "paragraph B"

criteria: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." *Id.* at 12.02A-B, 12.04A-B, 12.10A-B. The "paragraph A" criteria are different for each listing. In addition, listing 12.02 and 12.04 can be satisfied on a showing under "paragraph C." "Paragraph C" requires a showing of a disorder of at least two years duration, and repeated episodes of decompensation, a residual disease process, or a history of one or more years inability to function outside a highly supportive living arrangement. *Id.* at 12.02C, 12.04C.

The ALJ concluded that Deines's conditions did not satisfy "paragraph B's" criteria. This conclusion is supported by substantial evidence in the record as a whole. First, the ALJ found that the record only supported that Deines had a moderate restriction in his activities of daily living. This conclusion is supported by Deines own self-reported behavior, Tr. 28-33, 222-24, 192, 194; the evidence provided by Deines's mother, Tr. 183-86; and medical record evidence. *See, e.g.*, Tr. 353-54, 377-79, 413-15, 455, 459, 462, 488, 491-92.

Second, the ALJ concluded that Deines only had one episode of decompensation. The Court presumes that the sole episode of decompensation refers to Deines quitting his employment and moving home to his parents. Deines does not appear to dispute the fact that there was only one episode of decompensation.

Third, the ALJ concluded that the Deines only had moderate difficulties with concentration, persistence, or pace. This is supported by medical record evidence. *See, e.g.*, Tr. 328, 323-24, 326, 328, 354, 377-79, 415, 457, 459-60, 462-63, 466, 468,  470, 473, 476, 489, 492.  In particular, Dr. C. Pakyurek noted, in April 2008, that "[c]ompared to prior jobs that he has had, this job he [was] finally successful at. He [was] able to go to work, stay focused and organized, and [be] competent at his job." Tr. 459. Furthermore, throughout the treatment records it was noted that Deines memory was intact. *See, e.g.,* Tr. 354, 457, 460, 463, 466, 468, 470, 473, 489. This is consistent the record evidence that supports that Deines can complete tasks if they are simple and the instructions are written, Tr. 188, and Deines can sustain some tasks for very long period of time. Tr. 28-30, 188, 197, 269.

Fourth, the ALJ noted that while Deines's social functioning has been described as "quite impaired," Tr. 405, the record only supports moderate impairment. The ALJ's conclusion is supported by medical evidence, *see, e.g.*, Tr. 324, 328, 354, 404, 415, 429-45, 462, 469, 491, and other record evidence. *See* Tr. 172-73.  Furthermore, even if the ALJ erred as to this criterion, Deines's condition must manifest at least *two* criteria in order to satisfy "paragraph B." For the reasons set forth above, the ALJ did not err in concluding that Deines does not satisfy at least two "paragraph B" criteria and the ALJ's conclusion is supported by substantial evidence.

Finally, as stated earlier, the ALJ did not err in his weighing of the medical opinions.  Thus, for the reasons set forth above, the ALJ's conclusion under step three is supported by substantial evidence in the record as a whole.

### d.  Steps Four and Five: Residual Functional Capacity

In steps four and five, the ALJ assesses an individual's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(a)(4)(iv)-(v), 416.920(a)(4)(iv)-(v).  RFC is the most a claimant can do despite the limitations of the individual's impairments.  *Id.* at §§ 404.1545(a)(1), 416.945(a)(1).  "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence. The ALJ, however, still bears the primary responsibility for assessing a [Plaintiff's RFC] based on all relevant evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (citations and quotation omitted.)  The ALJ considers "all of the relevant medical and other evidence." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

The ALJ concluded based on the record that Deines had the RFC to perform a full range of work at all exertional levels.  The ALJ concluded that Deines mental abilities were limited in that he cannot tolerate changes in his work routine; he is limited to brief, superficial, and infrequent contact with others; and he is limited to simple and unskilled work.  These limitations are consistent with the opinions of the Dr. Felling's opinion, the state agency psychologists' opinions, the examining psychologist's opinion, Dr. C. Pakyurek's treatment records, and Deines's own statements. The specifics of these opinions were discussed and cited earlier in this Report and Recommendation and need

not be repeated here. As stated earlier, the ALJ did not err in his weighing of Drs. Cleveland and Luskin's opinions. Thus, this Court concludes that the ALJ's determination of Deines's RFC is supported by substantial evidence in the record as a whole.

## IV.   RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that: the Commissioner's Motion for Summary Judgment (Docket No. 13) be **GRANTED**; Plaintiff's Motion for Summary Judgment (Docket No. 7) be **DENIED**; and **JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: January 4, 2012                                       *s/ Tony N. Leung*
                                                            Tony N. Leung
                                                            United States Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **January 19, 2012**.